THE FARMINGTON RIVER COMPANY ET AL. *v.* TOWN PLAN AND ZONING COMMISSION OF THE TOWN OF FARMINGTON ET AL.

SUPERIOR COURT        HARTFORD COUNTY        FILE NO. 129072

Memorandum filed May 27, 1963 [1]

*Butler, Volpe, Garrity & Sacco,* of Hartford, for the plaintiffs.

*Day, Berry & Howard,* of Hartford, for the defendants.

COTTER, J. The plaintiffs are owners, operators, or lessors of properties, consisting of quarries and sand and gravel pits in the town of Farmington, which are zoned C-2 under the zoning regulations of the town of Farmington. The C-2 zone is commercial property devoted to the removal and excavation of

---

[1] Publication of this decision was determined upon after an appeal to the Supreme Court of Errors was withdrawn.

earth products. They seek a declaratory judgment and injunctive relief to determine whether the "Town of Farmington Regulations Pertaining to Removal of Earth Products" adopted by the town plan and zoning commission of the town of Farmington on June 12, 1961, effective July 1, 1961 (effective on existing operators on March 1, 1962), are invalid, null and void under the statutes and provisions of the Connecticut and United States constitutions and under the provisions of the zoning regulations of the town of Farmington adopted December 3, 1956, effective December 7, 1956, as amended. Injunctive relief is sought to enjoin the defendants from enforcing the "Town of Farmington Regulations Pertaining to Removal of Earth Products" against the plaintiffs, who claim the regulations are invalid, null and void as against the plaintiffs. Because of deposits of stone, rock, sand and other earth products in the town of Farmington, individuals and corporations have conducted considerable quarrying and other sand and gravel operations, so that there are a number of areas where the land has been excavated and permitted to remain in an unimproved excavated condition. These areas are dangerous and detrimental to public health, depreciate surrounding property, are unattractive, and cannot be used without substantial improvements. These properties also cause erosion, create dangerous pits and water holes, and result in permanent damage to the landscape. Some operations giving rise to these areas have terminated; in others, they are continuing. In many instances the area now excavated is only a small portion of the total C-2 area to be excavated in the future.

Photographs in evidence show the hazardous and detrimental existing conditions resulting from past excavations and removals. The pits and ponds caused by the sand and gravel excavations are a

constant hazard, requiring continual supervision by the town. Complaints are received by town officials about persons using the ponds for swimming, fishing, picnics and ice skating. During the summer, the police investigate two or three complaints a week concerning children of tender years using the ponds without supervision. Teenagers and adults likewise have occasion to frequent them. The Sherman pond is twelve to twenty feet deep and the Dunning pond is forty-five feet deep. On one occasion a forty-year-old man who had been drinking was found drowned in twelve feet of water in the Sherman pond. The deceased had stopped at the pond with a group of men for an outing and swimming. In some instances, the Sherman people called the Farmington police to investigate use of the pond by individuals. The Farmington River Company likewise has been troubled by people swimming in the pond on their property. Protective fences were not erected around the ponds in question.

The population of the town of Farmington was approximately 7000 in 1950 and 10,813 in 1960; its present population is estimated at 12,100 and by 1970 it is expected to reach 18,000 to 20,000, and the town is in a period of substantial growth. The hazards and devaluating effects on adjoining properties of such unprotected and ungraded excavation areas become greater. As a result of the growth of the town, more and more residential areas are being established closer to the C-2 areas, further increasing the hazard, and frequently access roads to the C-2 areas are passing through residential areas. It is beneficial to the surrounding property that such access roads be paved or treated so as to minimize dust conditions, as required in the regulations. Photographs in evidence show the lack of safeguards against erosion, the failure to preserve

topsoil, and the lack of seeding of the premises with an appropriate cover crop, as required by the regulations.

The high loss of life in Farmington resulting from the flooding of the Farmington River in 1955 indicates the peril of that river and the substantial risk of permitting unregulated sand and gravel operations in and about the river. Unchecked interfering with or disturbing of the flow, banks or bed of any river or any stream, particularly the Farmington River, might very well cause future harm or damage. Compliance with the regulations would avoid such harm or damage. Adequate provision for lateral support of adjacent properties is necessary, because of excavations sixty-five feet in depth, as provided in the regulations. Ponds and water holes resulting from excavations show the lack of proper drainage of past excavated premises as required by the regulations.

Action to prevent this pattern from continuing in the future was recognized by two agencies of the town of Farmington. The town council and the town plan and zoning commission held a conference and it was determined that although Public Act 239 of the 1955 legislative session had given the power to regulate the removal of soil, loam, sand or gravel to the town by ordinance (which in Farmington's case meant action by its town council), Public Act 354 of the 1957 legislative session had empowered a town through its zoning commission to regulate these operations in those towns where a zoning commission existed. The power to regulate the removal of earth products in the case of Farmington was vested in the zoning commission of Farmington, not as part of its zoning powers under chapter 124 of the General Statutes but as a town police power under § 7-148 of the General Statutes. The minutes

of the numerous meetings of the zoning commission with the plaintiffs attest to the numerous times the commission scheduled meetings with the plaintiffs to work with them, and the numerous concessions granted by the zoning commission to assist the plaintiffs. The plaintiffs accepted these concessions but nevertheless object to the enforcement of the regulations.

The zoning commission of Farmington obtained the services of M. A. Lincoln, a professional planner, to review the existing circumstances in Farmington and to recommend regulations. When these had been received, a public hearing and a series of meetings and conferences were held by the zoning commission, all of which were attended by the plaintiffs and their counsel. A number of modifications were made in the regulations at the request of the plaintiffs through their counsel. Finally, after months of consideration and revision in order to accommodate the plaintiffs, the commission adopted the "Town of Farmington Regulations Pertaining to Removal of Earth Products." The regulations became effective July 1, 1961. However, in order to give existing operators, the plaintiffs, sufficient time to file their applications and supporting data and have them acted upon by the commission, the commission, at the request of the plaintiffs, provided that the regulations were not to be binding upon the plaintiffs until eight months later, on March 1, 1962. Although (1) the regulations became effective on July 1, 1961, and (2) the plaintiffs were given an additional eight months to submit their applications and have them approved, of which plaintiffs were fully aware, no action whatsoever was taken by the plaintiffs to comply with the regulations. On February 1, 1962, one month before the regulations became binding on the plaintiffs, the town, as a courtesy, sent a further reminder to each of the

plaintiffs, advising them that the regulations became binding as to them on March 1, 1962. Again no action was taken by the plaintiffs until February 23, 1962, when the present action was commenced.

The "Town of Farmington Regulations Pertaining to Removal of Earth Products" were adopted pursuant to the authority conferred on towns to regulate the removal of soil, loam, sand or gravel through their zoning commissions by § 7-148 of the General Statutes, as amended (originally Public Acts 1955, No. 239, and Public Acts 1957, No. 354). No. 239 of the 1955 Public Acts provided in part: "An Act Authorizing Municipalities to Regulate the Removal of Soil, Loam, Sand or Gravel. . . . Any town, city or borough, in addition to such powers as it shall have under the provisions of the statutes or by any special act, shall have power by ordinance or by-law: . . . to regulate the removal of soil, loam, sand or gravel from land not in public use in the whole or in specified districts of the town, city or borough and to provide for the reestablishment of ground level and protection of the area by suitable cover . . . ." No. 354 of the 1957 Public Acts provided in part: "An Act Clarifying the Powers and Duties of Towns and Zoning Commissions in Regard to Regulation of Trailer Camps and Sand and Gravel Pits. . . . Any town, city or borough, in addition to such powers as it shall have under the provisions of the statutes or by any special act, shall have power by ordinance: . . . except as otherwise provided by special act and except where there exists a local zoning commission, which commission is then so empowered, to regulate and provide for the licensing of parked trailers, when located off the public highways, and trailer parks or mobile home parks and to regulate the removal of soil, loam, sand or gravel from land not in public use in the whole or in specified dis-

tricts of the town, city or borough and to provide for the reestablishment of ground level and protection of the area by suitable cover."

Section 7-148 as printed in the General Statutes, 1958 Revision, erroneously had inserted in it the semicolon which is italicized in the following: "Any town, city or borough, in addition to such powers as it has under the provisions of the statutes or by any special act, may, by ordinance: . . . except as otherwise provided by special act and except where there exists a local zoning commission, which commission is then so empowered, regulate and provide for the licensing of parked trailers, when located off the public highways, and trailer parks or mobile home parks; and regulate the removal of soil, loam, sand or gravel from land not in public use in the whole or in specified districts of the town, city or borough and provide for the reestablishment of ground level and protection of the area by suitable cover." This semicolon was erroneously continued in Public Acts 1959, No. 359, which made certain amendments not here relevant. The error was subsequently corrected by Public Acts 1961, No. 187, which deleted the semicolon. Likewise, the 1961 legislative session clarified the situation regarding the effect of regulations enacted by a local zoning commission pursuant to § 7-148 by adopting Public Act No. 570 as follows: "An Act Clarifying the Power of Towns to Regulate the Removal of Soil, Loam, Sand and Gravel. . . . Regulations enacted by a local zoning commission pursuant to this section [§ 7-148] shall have the same effect and application as an ordinance enacted pursuant to this section."

Section 1 of the regulations states the purpose to be the regulation of excavation and removal operations in order to prevent conditions detrimental to

the public safety, health and general welfare. Section 2 provides that the regulations shall apply to all excavations and removal within the town except as otherwise provided. Section 3A of the regulations governs incidental removal operations in other than a C-2 zone; that is, all operations other than large-scale commercial operations. For removal of less than 100 cubic yards of material, except loam or topsoil, a permit is required from the building inspector. For removal of any loam or topsoil, or of more than 100 cubic yards of other material, a special permit must be obtained from the town plan and zoning commission after submission of contour maps showing condition of premises before and after removal, furnishing of a cash deposit or surety bond equal to 20 percent of estimated cost of proposed grading and excavating, and a public hearing before the commission. This section further provides that no processing may be done on premises without a further special permit and that in no case may the processing include materials not to be used on the premises.

Section 3B governs removal operations in a C-2 zone, the issue in this case. The uses permitted in a C-2 zone are set forth in article 2, § 10, of "Zoning and Town Plan Regulations" of the town of Farmington, as follows: "The only permitted uses are the operation of stone, sand and gravel quarries; the removal of sand, stone, gravel, loam, peat and peat moss and the processing of materials extracted from the premises. All operations shall be so conducted that no dangerous condition shall be created, and no dust, odor, smoke, fumes, noise or vibration sufficient to constitute a nuisance shall result. On the abandonment of quarrying operations, the area abandoned shall not be used till rezoned by the Town Plan and Zoning Commission." Section 3B requires that a permit be obtained from the commission prior

to carrying on excavation and removal operations and sets out the requirements and the procedure for obtaining a permit, listing specific provisions which the commission shall consider in ruling on any application. Subsection 4 of § 3B sets out the requirements for regrading, resurfacing and reseeding following excavation and removal. Section 4 of the regulations provides penalties for failure to comply with the regulations.

It is the claim of the plaintiffs that they have substantial vested constitutional rights, guaranteed to them under article first, § 9, of the Connecticut constitution and the fifth and fourteenth amendments to the United States constitution. They argue strenuously against the permit requirement and say that they would have no quarrel with the regulations if they were not required to obtain a permit and would otherwise accept them.

The regulations were adopted under the so-called authority to provide for the safety, health and good order of society so that the citizens are protected, otherwise referred to in our jurisprudence as the police power. Under this power, reasonable regulation of the rights of property in a manner essential to the protection of the community from harm is allowed. Sometimes this power encompasses all legislation and practically every exercise of authority by government. "The State may regulate any business or the use of any property in the interest of the public welfare or the public convenience, provided it is done reasonably. *Connecticut Light & Power Co.* v. *Southbury,* 95 Conn. 242 . . . ." *State* v. *Bassett,* 100 Conn. 430, 432. The regulations do not violate the due process of law as guaranteed by the constitutions. The fifth amendment to the constitution of the United States does not restrain a state in the exercise of its authority; *Barron* v.

*Baltimore,* 32 U.S. (7 Pet.) 243 (1833); *Hallinger* v. *Davis,* 146 U.S. 314, 319 (1892); *Thorington* v. *Montgomery,* 147 U.S. 490, 492 (1893); and the due process clause of the fourteenth amendment to the United States constitution and that of the Connecticut constitution have the same meaning and impose the same limitations. *Proctor* v. *Sachner,* 143 Conn. 9, 17 (1955); *Cyphers* v. *Allyn,* 142 Conn. 699, 703 (1955); and cases cited therein. We are concerned with the question whether or not the regulations enacted by the town are a valid exercise of its police power. They are valid if the public interest requires regulation of plaintiffs' operations and if the regulations are reasonably necessary to accomplish their purpose and are not unduly oppressive. *Lawton* v. *Steele,* 152 U.S. 133, 137 (1894), cited in *Goldblatt* v. *Hempstead,* 369 U.S. 590, 594 (1962).

There is a presumption that the regulations are reasonable, and the plaintiffs have the burden of showing that the regulations are not reasonable. *Goldblatt* v. *Hempstead,* supra, 596; *Bibb* v. *Navajo Freight Lines, Inc.,* 359 U.S. 520, 529 (1959); *Salsburg* v. *Maryland,* 346 U.S. 545, 553 (1954); *United States* v. *Carolene Products Co.,* 304 U.S. 144, 152 (1938). " 'The "due process" clause does not prevent the State from making all needful regulations for the public welfare, and does not require compensation to be made in case these regulations are reasonable, although they do deprive the owner of use of his property. *Cusack* v. *Chicago,* 242 U.S. 526 . . . . There need be no fear that individual rights will be unduly subordinated to social rights, for each claimed exercise of the police power is subject, first, to the test of whether the case falls fairly within the subjects of the police power, and second, whether the means exercised, in quality and extent, are reasonable, reasonable in time, place and circumstance; and both tests are made and ascertained by the

courts.' *Windsor* v. *Whitney* . . . [95 Conn. 357, 369]. Every exercise of the police power in respect to the use of land is likely to affect property interests adversely, but this does not necessarily render the exercise unconstitutional. *State* v. *Hillman* . . . [110 Conn. 92, 103]; *Spector* v. *Building Inspector of Milton,* 250 Mass. 63, 70 . . . ; 3 McQuillin, Municipal Corporations (2d Ed.) § 942, p. 79." *State* v. *Kievman,* 116 Conn. 458, 466.

The court is satisfied that the *Goldblatt* case, supra, is authority for the defendants' position. In that case the town of Hempstead amended its ordinance regulating excavations of sand and gravel so as to prohibit any excavating below the water table. The plaintiffs had been mining sand and gravel since 1927. In 1945, the ordinance provided that such pits be enclosed by a wire fence and comply with certain berm and slope requirements. The plaintiffs complied with this, but the 1958 amendment made these requirements more onerous and also provided that they acquire a mining permit, which they did not do. In the present case, as in the *Goldblatt* case, the plaintiffs have failed to show that the requirements of the ordinance are so onerous or unreasonable as to result in a taking of their property without due process of law. There is sufficient reason for the ordinance.

The property of the plaintiffs has not been taken without just compensation. They may still operate, and a compliance would not be onerous, harsh or unreasonable. Even if it would, the governmental agency might act in such a case. *Vartelas* v. *Water Resources Commission,* 146 Conn. 650; *State* v. *Heller,* 123 Conn. 492.

The regulations were adopted by virtue of chapter 98 of the General Statutes and § 7-148, which gives the town of Farmington, in addition to its

statutory powers, the power by ordinance to "regulate the removal of soil, loam, sand or gravel from land not in public use in the whole or in specified districts of the town . . . and provide for the reestablishment of ground level and protection of the area by suitable cover." "Regulate" means to govern or direct according to rule, to bring under the control of constituted authority. Webster, Third New International Dictionary. The word can even infer limitations and prohibitions. *Hartland* v. *Jensen's, Inc.,* 146 Conn. 697, 702. It also means "arranging in proper order and controlling that which already exists." *Jeschor* v. *Guilford,* 143 Conn. 152, 159. A permit involves regulations, is a means of regulating or controlling certain conduct; the Liquor Control Act is regulatory, for instance. *State* v. *Zazzaro,* 128 Conn. 160, 163. That the present ordinance requires a permit does not invalidate it. *State* v. *Gordon,* 143 Conn. 698.

The ordinance is a reasonable and proper exercise of the police power, which comprehends a system of internal regulation. It has a reasonable relation to the public health, safety and welfare and shows reasonable judgment by the legislative body of the town. There is no showing that the town in adopting it acted unreasonably or in a discriminatory or arbitrary way, nor that the town was motivated by any improper purpose. An ordinance much more sweeping and onerous has been held valid and legal by our court in *Calve Bros. Co.* v. *Norwalk,* 143 Conn. 609, wherein a general contractor had been denied permission to remove gravel from a tract which it owned.

In this case, there is no showing that the plaintiffs are unable to comply with the requirements of the ordinance and so be forced to go out of business. In fact, one witness testified that he did not know the

cost of compliance. It is reasonable to suppose that they would be able to continue in business without too great a sacrifice, and in accordance with the requirements without an unreasonable financial investment.

This is not a taking of property by eminent domain but is a regulation of the use of property because uncontrolled use would injure the public. In the present case the use is merely restricted in conformance with the regulations. The plaintiffs have not been unconstitutionally deprived of their property or the use of it. The ordinance is a proper exercise of the police power of the town. *Goldblatt* v. *Hempstead,* supra; *Mott's Super Markets, Inc.* v. *Frassinelli,* 148 Conn. 481, 487; *Corsino* v. *Grover,* 148 Conn. 299, 311; *Connecticut Theatrical Corporation* v. *New Britain,* 147 Conn. 546, 553; *Snyder* v. *Newtown,* 147 Conn. 374, 389; *Buxton* v. *Ullman,* 147 Conn. 48, 55; *Vartelas* v. *Water Resources Commission,* supra, 654, 655; *State* v. *Heller,* supra, 500.

The issues are found, and judgment may enter, for the defendants.